IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JAQUONE L. PHILLIPS, | ) | CASE NO. 3:18CV860 |
| | ) | |
| Petitioner, | ) | JUDGE JEFFREY J. HELMICK |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| WARDEN RONALD ERDOS, | ) | |
| | ) | |
| Respondent. | ) | **REPORT & RECOMMENDATION** |

Petitioner Jaquone Phillips ("Petitioner" or "Phillips") brings this habeas corpus action pursuant to 28 U.S.C. § 2254. Doc. 1. Phillips is detained at the Southern Ohio Correctional Facility, having been found guilty by an Allen County, Ohio, Court of Common Pleas jury of one count of murder with a firearm specification and one count of having a weapon under a disability. *State v. Phillips*, Case No. CR2014 0180 (Allen Cty. Common Pleas Ct., filed March 13, 2015). At sentencing, the trial court sentenced Phillips to 3 years on the firearm specification, 15 years to life for murder, and 30 months for having a weapon under a disability, to be served consecutively, for an aggregate sentence of 20.5 years to life in prison. Doc. 9-1, pp. 36-37.

On April 9, 2018, Phillips filed his Petition for Writ of Habeas Corpus setting forth two grounds for relief. Doc. 1, pp. 6-8. This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2. As set forth more fully below, both of Phillips' grounds for relief are barred by the statute of limitations and/or procedurally defaulted. Thus, the undersigned recommends that Phillips' Petition for Writ of Habeas Corpus (Doc. 1) be **DISMISSED**.

# I. Background

In a habeas corpus proceeding instituted by a person in custody pursuant to the judgment of a state court, the state court's factual findings are presumed correct. 28 U.S.C. § 2254(e)(1). The petitioner has the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see also Railey v. Webb*, 540 F. 3d 393, 397 (6th Cir. 2008).

## A. State Court Action

### 1. Underlying Facts

The following summary of underlying facts is taken from the opinion of the Allen County Court of Appeals, Third Appellate District of Ohio:[1]

> {¶ 2} On April 22, 2014, the Allen County Grand Jury returned a three-count indictment against Phillips for one count of murder with a firearm specification, one count of felonious assault with a deadly weapon, also with a firearm specification, and one count of having weapons while under disability. The charges stemmed from an incident occurring on April 12, 2014, at approximately 3:55 a.m., at H & R's Lounge in Allen County, Ohio, where then eighteen-year-old Phillips was alleged to have shot and killed eighteen-year-old Marcus D. Simpson, Jr. during a physical altercation. The felonious assault charge arose from the allegation that Phillips also shot Devontae K. Williams, who suffered a non-lethal gunshot wound as a result of the same incident. Phillips had been previously adjudicated a delinquent child due to his commission of an aggravated robbery as a juvenile and was prohibited from lawfully carrying a firearm.
>
> \* \* \*
>
> *1. Emily's W. Testimony*
>
> {¶ 14} Emily W. was called as a witness for the prosecution and was the first witness to provide testimony before the jury regarding Phillips' identity on the video surveillance footage. Emily stated that at the time of the shooting in April 2014 she was best friends with Phillips' younger sister, Latavia ("Tavi"), and as a result saw Phillips on a regular basis. She explained that Phillips was the leader of a "gang" called the "Cash Crew" or "CCE," which had a well-known rivalry with another group called the "Eastside" or "Eastsiders." (Tr. at 286–87). According to Emily, both Simpson and Williams were affiliated with the Eastside group.[]

---

[1] Phillips has not demonstrated by clear and convincing evidence that the state court's findings were incorrect. Accordingly, the state court's findings are presumed correct. *See* 28 U.S.C. § 2254(e)(1); *see also Railey*, 540 F. 3d at 397.

{¶ 15} Emily recalled meeting Tavi at Phillips' family home on Madison Avenue on April 11, 2014, at around 10:30 p.m., when she finished her shift at work. She observed Phillips dancing outside the home with friends and waving a gun in the air. That night, Emily drove a rental car and volunteered to drive a group of individuals, which included Phillips and Tavi, and two others, Jariay T. and Drake J., to AJ's, a local bar. After the bar closed, Emily drove the group to H & R's Lounge, an afterhours club. The prosecution introduced surveillance video taken from inside the entrance to the club. (State's Ex 15). Emily identified Phillips on the interior surveillance footage at 3:05 a.m. attempting to gain entry into the club, being denied access, and exiting through the front door. She identified Phillips wearing a dark grey sweatshirt with a white Nike "swoosh" symbol and a black hat.

{¶ 16} Emily explained that after she dropped off Phillips and Drake at the club, she, Tavi, and Jariay remained in the vehicle because they were underage and knew they could not get in. They were also waiting to see if Phillips and Drake could get into the club. Emily recalled Tavi receiving a text from Phillips and remembered seeing Phillips' name appear on the phone. Tavi then read the text out loud to Emily, which asked Tavi to retrieve Phillips' gun from their home on Madison Avenue, less than a ten minute drive from the club.

{¶ 17} Emily drove Tavi and Jariay to the Madison Avenue house. Emily observed Tavi get out of the car and go to the side of the house where some vehicles were parked. She recalled Tavi's hands being empty when she exited the vehicle. In the meantime, Emily went into the house to use the bathroom, when she returned to her vehicle Tavi was still outside the home searching for something. Tavi eventually came back to the vehicle holding a maroon case with a zipper in her hands. Upon sitting in the vehicle, Tavi placed the case in her lap. Emily asked Tavi to hide the case somewhere because she did not want the case in plain view in the event that they were stopped by law enforcement. Emily observed Tavi place the case in the side compartment of the passenger door.

{¶ 18} Emily, Tavi, and Jariay returned to H & R's after stopping at the Madison Avenue home. Phillips and Drake were standing outside of the club and climbed into the vehicle. According to Emily, Drake sat in the middle back seat and Phillips sat in the passenger back seat, behind Tavi. Emily recalled that Phillips was not in the car very long before Tim W., a fellow CCE member and Jariay's boyfriend, informed Phillips through the car window that Aaron J. or "Red," a member of Eastside, was also in the parking lot of the club.[] Shortly thereafter, Emily observed Phillips exit the car and remembered seeing him talking with some friends in the parking lot.

{¶ 19} Emily moved the vehicle and parked it to the side of the club's entrance. The prosecution played surveillance video footage of the parking lot and asked Emily to identify her vehicle. (State's Ex. 14). At the time, Tavi, Jariay, and Drake were still in the vehicle. Emily narrated what occurred on the video as she remembered it from that night. Emily reversed the vehicle from the parking space on the side of the club and turned it to face a different direction. She explained that she did this at Tavi's request so that Tavi could get a better look at an impending physical altercation brewing in the parking lot between Tim W. and Red. Emily then witnessed Tim W. hit Red through the window of a

3

white vehicle Red was sitting in. Emily recalled that Tavi and Jariay exited the vehicle as a fight broke out in the crowd that had amassed around the vehicle where Red was seated. She identified the location on the video where Tavi and Jariay were standing in the parking lot.

{¶ 20} Emily backed her vehicle into where she was previously parked and faced the parking lot as the fight escalated to involve several more individuals. Emily recalled hearing three gunshots, watching people scatter, and observing Phillips run towards her vehicle shortly thereafter. She identified Phillips on the surveillance footage as the individual running toward her vehicle. (Tr. at 318). At this point only Emily and Drake were in the car when Phillips jumped into the front passenger seat of the vehicle. She testified that Phillips immediately instructed her to "Go, Go, Go." (Tr. at 319). Emily asked about Tavi, whose cell phone and other personal effects were still in the vehicle. Phillips told her "It's okay. She'll find a ride. Just keep going." (Id.).

{¶ 21} Emily drove the vehicle out of H & R's parking lot and began driving toward Drake's house at Phillips' direction. Phillips changed his mind and told her to drop them off at a park near Drake's house. Emily, now alone in the vehicle, drove back to H & R's to look for Tavi, but at that point law enforcement had arrived to secure the scene. Phillips contacted Emily and she picked Phillips and Drake up from Drake's home. While in the vehicle, Emily answered a call from Divante H. on Tavi's phone, who directed Emily to drive Phillips and Drake to his house. There, various individuals who had been at H & R's gathered and discussed what had transpired. Emily recalled several people bragging about who they were fighting with in H & R's parking lot. She remembered Phillips talking about fighting with Simpson. While at Divante's home, the group learned through social media of Simpson's death. Emily identified Simpson from a photograph taken at the scene, which depicts him lying in the doorjamb of the driver side door of his vehicle shortly before his death.

{¶ 22} Emily recalled seeing the maroon zippered case again when she dropped off Marquise G. at his home. This was the first time Marquise was in her vehicle. As Marquise walked onto the porch, Drake, who was seated in the back seat of the car, noticed the maroon case on the floor in the back seat on the passenger side. Emily observed Drake lobbing the case out of the car to Marquise, stating "Hey, he left this in the car." (Tr. at 380). She noticed that the case appeared empty because of the way Drake tossed it to Marquise. Phillips was not in the vehicle at the time.

{¶ 23} A few days after the incident, Emily called Phillips to inform him that she was going to see a lawyer because a detective wanted to speak to her about the incident at H & R's lounge. She warned Phillips that law enforcement may also be looking for him. Phillips instructed Emily to tell her attorney that none of the individuals in her car that night were involved in the fight in the parking lot. Later that day, after speaking to her attorney and law enforcement, she drove to her parents' house. As she exited her car, she noticed Phillips sitting in a nearby parked car, smiling at her. Phillips asked her how the meeting with her attorney went and if she repeated the story he told her to tell. Emily responded "Yeah" and then her father came outside. (Tr. at 327). Phillips asked her if the man was her father to which she responded "Yeah" and then Phillips left. (Id). Emily

4

went inside the house and looked out the window. She observed Phillips drive past her house again.

*2. Phillips' Statements to Law Enforcement*

{¶ 24} On April 15, 2014, Detective Baker conducted an interview with Phillips regarding the shooting at H & R's Lounge. At trial, a video recording of this interview was introduced by the prosecution during Detective Baker's testimony. (State's Ex. 20). In the interview, Phillips recalled driving from AJ's to H & R's on April 12, 2014. On that night, he said he wore a grey hooded sweatshirt with a Nike "swoosh," camo pants or "black Levi's." He recounted his attempts to get into the club which were eventually rejected. Phillips remembered he and Drake returned to Emily's vehicle which was parked in the club's parking lot. Phillips acknowledged that he exited Emily's car before she moved to park near the club as seen on the parking lot surveillance footage.

{¶ 25} Phillips described the fight breaking out involving Tim W. and Red, which escalated to involve several other individuals including Simpson and Williams. He admitted to being part of the group fighting, however, he denied having a gun that night and he denied shooting Simpson. Instead, Phillips claimed he was engaged in the brawl hitting Williams when he heard two gun shots. Phillips recalled seeing Simpson fall to the ground after he heard the shots. (State's Ex. 20 at 59:20). He stated that he started to run and noticed his phone falling out of his hooded sweatshirt. (Id. at 59:29). Phillips admitted to bending down by a car to pick up his phone. (Id. at 59:35). He then ran to where he thought Emily's car was parked in the parking lot, but found it was no longer there. That is when he ran over to Tavi and asked, "Where's the car at. Come on!" and Tavi showed him where Emily's vehicle was now parked, however, Tavi remained in the parking lot engaged in the fight. (Id. at 59:45; 1:07:42). Phillips admitted that he then ran to Emily's car, got in, and left H & R's. (Id. at 59:50).

*3. Video Surveillance Footage of H & R's Parking Lot*

{¶ 26} The video surveillance footage of H & R's parking lot was played during the testimony of Emily and Detective Baker. The video is approximately five minutes long and depicts the events immediately before, during, and after the shooting of Simpson. At the beginning of the video, an individual wearing a dark grey hooded sweatshirt, camo pants, and dark shoes can be seen congregating with two other individuals near Simpson and Williams at the entrance of the club. The three individuals begin to follow Simpson and Williams as they walk away and appear to engage in a dialogue with them as they all continue to walk toward the parking lot. During this time more individuals approach to form a group around a white car attempting to leave a parking space next to Simpson's gold Tahoe in the parking lot.

{¶ 27} At this time, Emily's car, which is parked near the club's entrance, can be seen reversing out of the parking space and changing direction to face toward the now amassed group of people surrounding the white vehicle. As the activity of the group begins to escalate, two females exit Emily's vehicle—one from the front passenger door and one from the rear driver side door. The two females join the group surrounding the

5

white car, which is now in the driveway blocking the flow of traffic. Emily reverses her vehicle into the same parking space where she was previously parked. The group of individuals begins to push and shove one another and move as a group behind Simpson's parked vehicle. As they round the front of the vehicle, the flurry of activity intensifies into punches being thrown between Simpson, Williams, and several other individuals.

{¶ 28} The melee continues around to the driver side of Simpson's vehicle where Simpson is now located near the driver side door. The individuals engaged in the skirmish with Williams break away from Simpson, continue past Simpson's vehicle and proceed into the gravel driveway. As the group involving Williams passes the back end of Simpson's vehicle, a person in a dark grey hooded sweatshirt, dark pants, and dark shoes rises up from the ground, near a parked white car, in a shooting stance with a gun pointed at Simpson, who is still located by the driver side door of his vehicle. People scatter as the gun appears to be fired. The individual seen in the shooting stance runs toward some parked cars and then returns to where the gun was fired to pick something up from the ground. The individual runs toward one of the females who earlier exited Emily's vehicle. The female points to where Emily's vehicle is parked and the individual runs to Emily's vehicle, which drives away shortly thereafter.

*4. Detective Baker's Testimony*

{¶ 29} At trial, Detective Baker testified that he was the lead investigator assigned to the case. He explained that he obtained the surveillance video from H & R's lounge at around 8:00 a .m. on the morning of April 12, 2014—a few hours after the shooting. He recalled reviewing the footage of the parking lot depicting the shooting "hundreds" of times. (Tr. 416). He stated that the only people he was able to identify from his initial review of the footage were Simpson and Williams—the two shooting victims—and that the video itself was not enough to reveal the identity of the person seen in the "two-hand high point shooting position" firing at Simpson. (Tr. at 420). He explained that he interviewed "numerous" individuals to assist him with identifying the shooter and the many other individuals seen participating in the events surrounding the shooting. (Id. at 423).

{¶ 30} After learning the identity of the key participants, Detective Baker described the distinct clothing that many of these individuals wore that night which assisted him in distinguishing the different figures in the footage. The parking lot video was recorded on a camera located at some distance from where the shooting occurred and did not provide a clear picture of these individuals' faces. Detective Baker used the distinctive clothing of each individual to follow them through the video footage and observe their conduct. He was also able to match some of these individuals to footage from inside the club's entrance which provided clearer picture of the individuals' faces and was recorded from a much closer distance. Phillips was one such individual.

{¶ 31} Detective Baker observed Phillips from the interior surveillance footage wearing a grey hooded sweatshirt with a Nike white "swoosh" and camo pants. (Tr. 431). He explained that the same individual identified as Phillips is also seen on the parking lot video footage standing near the club's entrance wearing the same clothes and dark shoes. Detective Baker explained the dark shoes were significant in reviewing the parking lot

6

video because the other individuals seen near Phillips are wearing dark clothes and white shoes. On the stand, Detective Baker narrated the actions taking place on the video and identified the key participants for the jury. In particular, he tracked Phillips' movements throughout the video and identified Phillips as the individual in the shooting stance firing a gun at Simpson and eventually running to Emily's vehicle.

{¶ 32} Detective Baker explained how Phillips' statements during the interview with him corroborated his identification of Phillips as the shooter on the video. He described "back tracking" the video from where the shooter ran to Emily's rental car to where the shooting took place which establishes that the same person running to that vehicle was the same person seen in the shooting stance. Detective Baker further noted that Phillips' own recollection and statement of his actions after the shooting during the interview mirrored those taken by the shooter on the video. Specifically, that after the shooting, Phillips said he picked up his phone which he dropped near a parked car, ran to where he thought Emily's car was parked, ran to his sister to find out where the car had been moved, and then jumped into Emily's vehicle. In his testimony, Detective Baker thus demonstrated that these were the same actions taken by the individual in the two-hand high point shooting position on the video.

*State v. Phillips*, 2016 WL 2957049, at *1, 4-8 (Ohio Ct. App. May 23, 2016).

### 2. Procedural History

On April 22, 2014, an Allen County Grand Jury issued an indictment charging Phillips with one count of murder with a firearm specification, R.C. 2903.02(A), one count of felonious assault with a firearm specification, R.C. 2903.11(A)(2), and one count of having a weapon under a disability R.C. 2923.13(A)(2). Doc. 9-1, pp. 3-6.

The state moved to dismiss the felonious assault charge and specification, which the court granted. Doc. 9-1, p. 9. The case proceeded to trial. After the state rested, Phillips, through counsel, made an oral motion for acquittal under Ohio Crim.R. 29(A), which the trial court overruled. Doc. 9-1, p. 10. Phillips renewed his Ohio Crim.R. 29(A) motion when the defense rested and the trial court overruled the motion. Doc. 9-1, p. 10. The jury found Phillips guilty of both counts on March 11, 2015. Doc. 9-1, p. 10.

On April 29, 2015, Phillips filed a motion for leave to file delayed motion for new trial, alleging juror misconduct.  Doc. 9-1, pp. 13-17.  On May 19, 2015, the trial court overruled Phillips' motion.  Doc. 9-1, pp. 30-33.

On June 17, 2015, the trial court sentenced Phillips to 3 years on the firearm specification, 15 years to life for murder, and 30 months for having a weapon under a disability, to be served consecutively, for an aggregate sentence of 20.5 years to life in prison.  Doc. 9-1, pp. 36-37.

### B. Direct Appeal

On July 16, 2015, Phillips, through new counsel, appealed to the Ohio Third District Court of Appeals.  Doc. 9-1, pp. 40, 42, 44.  In his brief, he raised the following assignments of error:

> 1. Mr. Phillips was denied his right to effective assistance of counsel and his confrontation clause rights, as guaranteed by both the United States Constitution and the Ohio Constitution, when the trial court allowed Det. Baker to testify about a video tape with his knowledge purportedly based on the statements of others not presented as witnesses by the state with no objection from defense counsel.
>
> 2. Mr. Phillips was denied his right to effective assistance of counsel and his jury trial rights, as guaranteed by both the United States Constitution and the Ohio Constitution, when defense counsel failed to properly and timely investigate multiple instances of juror bias and impropriety and when weak objections were overruled.

Doc. 9-1, p. 45.  On May 23, 2016, the Ohio Court of Appeals overruled Phillips' assignments of error and affirmed the judgment of the trial court.  Doc. 9-1, p. 109-140.

### C. Motion to Vacate Costs

On August 12, 2016, Phillips, pro se, filed a motion to vacate and suspend previously imposed court costs.  Doc. 9-1, pp. 151-153.  The trial court denied Phillips' motion.  Doc. 9-1, pp. 155-156.

### D. Motion for Delayed Appeal

On January 9, 2017, Phillips filed a notice of appeal and motion to file a delayed appeal with the Ohio Supreme Court.  Doc. 9-1, pp. 142, 144.  On March 15, 2017, the Ohio Supreme Court denied Phillips' motion for a delayed appeal and dismissed the case.  Doc. 9-1, p. 150.

### E. Federal Habeas Petition

On April 9, 2018, Phillips, pro se, filed his Petition for a Writ of Habeas Corpus.  Doc. 1. He listed the following grounds for relief:

> **Ground One**: Phillips was denied his constitutional right to effective assistance of counsel and right to confrontation.
>
> **Supporting Facts:** Phillips was denied his right established by the confrontation clause when the trial court plainly permitted Detective Baker to testify about the video tape based upon knowledge obtained from those whom did not testify at trial. Trial counsel failed to object.
>
> **Ground Two**: Phillips was denied his constitutional right to effective assistance of counsel and right to fair trial and trial by jury.
>
> **Supporting Facts:** The trial counsel in this matter failed to properly and timely investigate multiple instances of juror bias and impropriety and asserted weak objections. The issues were not timely filed to the Ohio Supreme Court for review.

Doc. 1, pp. 6-8.  Respondent filed a Return of Writ (Doc. 9), Phillips filed a Traverse (Doc. 10), and Respondent filed a Reply (Doc. 12).

### II. Standard of Review under AEDPA

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a petitioner must meet certain procedural requirements in order to have his claims reviewed in federal court.  *Smith v. Ohio Dep't of Rehab. & Corr.,* 463 F.3d 426, 430 (6th Cir. 2006). "Procedural barriers, such as statutes of limitations and rules concerning procedural default and exhaustion of remedies, operate to limit access to review on the merits of a constitutional claim." *Daniels v. United States*, 532 U.S. 374, 381 (2001).  Although procedural default is sometimes confused with exhaustion, exhaustion and procedural default are distinct concepts.  *Williams v.*

9

*Anderson*, 460 F.3d 789, 806 (6th Cir. 2006). Failure to exhaust applies when state remedies are "still available at the time of the federal petition." *Id.* at 806 (quoting *Engle v. Isaac*, 456 U.S. 107, 125 n.28 (1982)). In contrast, when state court remedies are no longer available, procedural default rather than exhaustion applies. *Williams*, 460 F.3d at 806.

**Exhaustion.** A federal court may not grant a writ of habeas corpus unless the petitioner has exhausted all available remedies in state court. 28 U.S.C. § 2254(b)(1)(A). A state defendant with federal constitutional claims must fairly present those claims to the state courts before raising them in a federal habeas corpus action. 28 U.S.C. § 2254(b), (c); *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam); *Picard v. Connor*, 404 U.S. 270, 275–76 (1971); *see also Fulcher v. Motley*, 444 F.3d 791, 798 (6th Cir. 2006) (quoting *Newton v. Million*, 349 F.3d 873, 877 (6th Cir. 2003)) ("[f]ederal courts do not have jurisdiction to consider a claim in a habeas petition that was not 'fairly presented' to the state courts"). A constitutional claim for relief must be presented to the state's highest court in order to satisfy the fair presentation requirement. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845-48 (1999); *Hafley v. Sowders*, 902 F.2d 480, 483 (6th Cir. 1990). In order to satisfy the fair presentation requirement, a habeas petitioner must present both the factual and legal underpinnings of his claims to the state courts. *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000). This means that the petitioner must present his claims to the state courts as federal constitutional issues and not merely as issues arising under state law. *See, e.g.*, *Franklin v. Rose*, 811 F.2d 322, 325 (6th Cir. 1987); *Prather v. Rees*, 822 F.2d 1418, 1421 (6th Cir. 1987).

**Procedural Default.** Procedural default may occur in two ways. *Williams*, 460 F.3d at 806. First, a petitioner procedurally defaults a claim if he fails "to comply with state procedural rules in presenting his claim to the appropriate state court." *Id*. In *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986), the Sixth Circuit provided four prongs of analysis to be used when

10

determining whether a claim is barred on habeas corpus review due to petitioner's failure to comply with a state procedural rule: (1) whether there is a state procedural rule applicable to petitioner's claim and whether petitioner failed to comply with that rule; (2) whether the state court enforced the procedural rule; (3) whether the state procedural rule is an adequate and independent state ground on which the state can foreclose review of the federal constitutional claim and (4) whether the petitioner can demonstrate cause for his failure to follow the rule and that he was actually prejudiced by the alleged constitutional error. *See also Williams*, 460 F.3d at 806 ("If, due to the petitioner's failure to comply with the procedural rule, the state court declines to reach the merits of the issue, and the state procedural rule is an independent and adequate grounds for precluding relief, the claim is procedurally defaulted.") (citing *Maupin*, 785 F.2d at 138).

Second, "a petitioner may procedurally default a claim by failing to raise a claim in state court, and pursue that claim through the state's 'ordinary appellate review procedures.'" *Williams*, 460 F.3d at 806 (citing *O'Sullivan*, 526 U.S. at 848). "If, at the time of the federal habeas petition, state law no longer allows the petitioner to raise the claim, the claim is procedurally defaulted." *Id*. While the exhaustion requirement is technically satisfied because there are no longer any state remedies available to the petitioner, *see Coleman v. Thompson,* 501 U.S. 722, 732 (1991), the petitioner's failure to have the federal claims considered in the state courts constitutes a procedural default of those claims that bars federal court review. *Williams,* 460 F.3d at 806.

To overcome a procedural bar, a petitioner must show cause for the default and actual prejudice that resulted from the alleged violation of federal law or that there will be a fundamental miscarriage of justice if the claims are not considered. *Coleman*, 501 U.S. at 750.

### III. Claim Analysis

**A. Statute of limitations**

Respondent alleges that Phillips' Petition is barred by the one-year statute of limitations set forth in 28 U.S.C. § 2244(d)(1). Doc. 9, p. 13-14. He asserts, and Phillips does not contest, that the one-year limitations period began to run on July 8, 2016, and expired on July 10, 2017. Doc. 9, p. 14; Doc. 10, p. 1. Phillips filed his Petition on April 9, 2018, nine months late.

Phillips argues that he is entitled to equitable tolling because unavoidable circumstances beyond his control prevented him from timely filing his Petition, and cites *Holland v. Florida*, 560 U.S. 631 (2010), in support. Doc. 10, p. 1. In *Holland*, the Supreme Court reiterated that a petitioner is entitled to equitable tolling "only if he shows (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." *Id*. at 649 (quoting *Pace v. DiGuglielmo*, 544 U.S., 408, 418 (2005) (internal quotation marks omitted)).

Phillips does not show that he is entitled to equitable tolling because he has not been pursuing his right diligently and no extraordinary circumstances stood in his way. He asserts that he was placed in restrictive housing with no library access on June 19, 2017, and remained in restrictive housing until November 21, 2017. Doc. 10, p. 2; Doc. 1-2, p. 2. Even if true, this accounts for the twelfth month of the limitations period; it does not account for the previous eleven months whereupon Phillips was apparently not in a restrictive housing unit and thus had access to the library. It appears that, once Phillips was out of restrictive housing, he spent his time (from December 2017 to March 2018), at least in part, gathering materials from the prison to indicate that he was in a restrictive unit from June to November 2017 and collecting information regarding his financial condition, presumably in preparation for his in forma pauperis application. See Docs. 1-1 through 1-6.

12

In *Solomon v. United States*, 467 F.3d 928, 930-931 (6th Cir. 2006), the court found that a petitioner was diligent in pursuing his rights when, in January 27, 1997, three months prior to the expiration of his limitations period on April 24, 1997, he filed a motion for transcripts in the district court indicating it was for his habeas petition; 14 days prior to the expiration date he filed a notice of intent to file a habeas petition but also explained that, due to circumstances outside his control, he may not be able to file his petition before the expiration date; 10 days prior to the expiration date filed a motion asking the court to expedite its ruling on his motion for transcripts so he could file by the deadline; and he filed his habeas petition two months after the deadline, on June 26, 1997. On March 19, 1997 (a month before the deadline), the petitioner had been transferred from an Illinois facility to a new facility in Oklahoma without his legal materials and placed in administrative detention, with restrictive library access, pending his transfer to Tennessee to be a witness in an upcoming trial. *Id*. at 934. Upon his transfer to Oklahoma, he arranged to call the district court's clerk's office to inform the court of his predicament and he filed his place-holding notice. *Id*. Once back in the Illinois prison, he completed and filed his habeas petition within a month. *Id*. All this was against the backdrop of Congress' adoption of the AEPDA one-year limitations period on April 24, 1996; the petitioner also alleged that he learned of the new one-year limitations period sometime around January 1997, when this information began circulating around the prison, and that it was difficult to gain library access due to all the prisoners requiring library access to comply with AEPDA's new one-year requirement. *Id*. at 933.

In this case, the AEPDA one-year limitations period was well established at the time of Phillips' conviction in 2015. He does not allege that he had no library access for the first 11 months of his limitations period. Although he was transferred to another prison (after his limitations period expired), he does not allege that he was forced to leave his legal documents

13

behind. When he allegedly regained library access, he did not file his habeas petition until 4 ½ months later. In short, Phillips does not show that he has been pursuing his rights diligently and that some extraordinary circumstance stood in his way and prevented timely filing. *See, e.g., Hall v. Warden, Lebanon Corr. Inst.*, 662 F.3d 745, 751-752 (6th Cir. 2011) (distinguishing *Solomon* after detailing the very specific facts presented in that case). Accordingly, he is not entitled to equitable tolling. And, for the reasons explained infra (in section B.3), he does not show actual innocence to overcome AEDPA's one-year limitations requirement.

### B. Procedural default

In the event the Court finds that Phillips is entitled to equitable tolling, his two grounds for relief are procedurally defaulted.

#### 1. Both Phillips' grounds are procedurally defaulted

In Ground 1, Phillips argues that his trial counsel was ineffective when he did not object to Detective Baker testifying at trial about a videotape based on knowledge he obtained from those who did not testify at trial. Doc. 1, p. 6. In Ground 2, Phillips argues that trial counsel was ineffective for failing to properly investigate multiple instances of juror bias and impropriety and "asserted weak objections." Doc. 1, p. 8. Both grounds for relief are procedurally defaulted because Phillips did not timely appeal the Ohio Court of Appeals' decision affirming the trial court's judgment to the Ohio Supreme Court. *See Williams*, 460 F.3d at 806 (a petitioner procedurally defaults a claim when he fails to pursue it through the state's ordinary appellate review procedures). Phillips filed a Motion for Leave to File a Delayed Appeal in the Ohio Supreme Court, but the Ohio Supreme Court dismissed his appeal, thereby enforcing its procedural rule. *See Bonilla v. Hurley*, 370 F.3d 494, 497 (6th Cir. 2004) (petitioner's ground for relief was procedurally defaulted on federal habeas review because he failed to timely appeal to the Ohio Supreme Court and the Ohio Supreme Court denied his motion for leave to file a

14

delayed appeal, thereby enforcing a procedural rule); *Williams*, 460 F.3d at 806 ("If, due to the petitioner's failure to comply with the procedural rule, the state court declines to reach the merits of the issue, and the state procedural rule is an independent and adequate grounds for precluding relief, the claim is procedurally defaulted.").

### 2. Phillips does not show cause to excuse his procedural default

As cause to excuse his procedural default, Phillips argues that he did not file a timely appeal to the Ohio Supreme Court because he was held in segregation and not given access to legal assistance or his materials. Doc. 1, pp. 6, 8. The Ohio Court of Appeals' decision affirming the trial court's judgment was issued on May 23, 2016; Phillips had 45 days, until July 7, 2016, to file his appeal. *See* S.Ct.Prac.R. 7.01 (A)(1)(a)(i). Phillips' alleged lack of legal assistance does not constitute cause to excuse his defaulted claims because a defendant has no right to counsel for a discretionary appeal to the Ohio Supreme Court. And limited access to the law library is not sufficient cause to excuse a procedural default. *See Bonilla*, 370 F.3d at 498 (pro se status and limited library access not cause to excuse procedural default).

In his Petition, Phillips states that he was placed in a segregation unit and "was not given any legal assistance or material to properly file any appeal." Doc. 1, p. 6, 8. However, in an affidavit attached to his motion for delayed appeal to the Ohio Supreme Court, Phillips stated that he first asked to use the prison library on November 18, 2016, and had limited access to the library—two hours on November 30 and two hours on December 15—to "complete" his filings. Doc. 9-1, pp. 148-149. In other words, Phillips had limited access, not no access, to legal assistance, his materials, and the law library and he was able to complete his filing in two visits during a 15-day span all within a month's time. These facts do not describe a limitation severe enough to constitute cause to excuse a procedural default. *See Bonilla*, 370 F.3d at 498. Moreover, by the time Phillips first allegedly asked the prison for access to the law library he had

15

already missed the 45-day time frame within which to file his appeal. See Docs. 9-1, pp. 148-149.

Phillips does not assert other grounds for cause in his Petition or his Traverse. In his motion for delayed appeal to the Ohio Supreme Court, Phillips alleged that his filing was late due to appellate counsel's failure to communicate to Phillips that he was not pursuing an appeal on Phillips' behalf and/or counsel's indicating to Phillips' family that counsel was pursuing an appeal on Phillips' behalf. Doc. 9-1, pp. 145-148. Even if the Court were to consider this reason as alleging cause despite the fact that Phillips did not assert it in his federal habeas filings, it would fail.

First, Phillips admits appellate counsel promptly informed him of the Ohio Court of Appeals' decision. Doc. 9-1, p. 146. *See Smith v. State of Ohio Dept. of Rehab. & Corr.*, 463 F.3d 426, 433, n.4 (6th Cir 2006) (the right to counsel includes appellate counsel informing the defendant of the outcome of the direct appeal of right). Thus, appellate counsel performed his duties as required when he promptly notified Phillips of the Ohio Court of Appeals' decision. The fact that Phillips "interpreted" appellate counsel having not "enclose[d] any further information, instructions, or explanations as to appellate procedures" as meaning that counsel would file a discretionary appeal to the Ohio Supreme Court on his behalf is not cause to excuse procedural default. *See Arnold v. Warden, Lebanon Corr. Inst.*, 832 F.Supp.2d 853, 858-859 (S.D.Ohio 2011) (the failure of appellate counsel to alert the petitioner of a deadline for filing a discretionary appeal to the Ohio Supreme Court is not cause to excuse a procedural default because a petitioner does not have a constitutional right to counsel on a discretionary appeal to the Ohio Supreme Court, citing *Coleman v. Thompson*, 501 U.S. 722, 755-757 (1991)). Nor is Phillips' assertion that his family, upon speaking to appellate counsel on unspecified dates, was

told that appellate counsel was handling the appeal. *Id*. (no right to counsel for a discretionary appeal).

Second, any alleged ineffectiveness of Phillips' appellate counsel cannot constitute cause to excuse his procedural default because Phillips procedurally defaulted any such ineffective assistance of appellate counsel claim. *See Edwards v. Carpenter*, 529 U.S. 446, 450-451 (2000) (when a petitioner procedurally defaults an ineffective assistance of counsel claim, ineffective assistance of counsel cannot serve as cause to excuse the procedural default of the underlying claim unless the petitioner can show cause and prejudice to excuse the ineffective assistance of counsel procedural default); *Smith*, 463 F.3d at 436, n.7. Phillips did not file a Rule 26(B) Application alleging ineffective assistance of appellate counsel; therefore, any ineffective assistance of appellate counsel is itself procedurally defaulted and cannot constitute cause to excuse the procedural default of his underlying claim. *See id.*; *see also Barkley v. Konteh*, 240 F.Supp.2d 708, 714 (N.D.Ohio 2002); *Bulter v. Sheldon*, 2014 WL 584747, at *6 (N.D.Ohio Feb. 12, 2014). And Phillips does not allege cause to excuse his procedural default of an ineffective assistance of appellate counsel claim. Any assertion that he had limited prison library resources does not constitute cause, *Bonilla*, 370 F.3d at 498, and, furthermore, is belied by the record. Doc. 9-1, pp. 145-146; 151-153.

### 3. Phillips does not show he suffered a fundamental miscarriage of justice

Finally, Phillips has not shown that he suffered a fundamental miscarriage of justice, i.e., that his is "an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. 478, 496 (1986). A claim of actual innocence "requires the petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup v.*

*Delo*, 513 U.S. 298, 324, 327 (1995). Phillips argues that there was no physical or direct evidence linking him to the crime and he complains of juror bias. Doc. 10, pp. 3-7. He does not claim innocence or present new reliable evidence to show that he is actually innocent. *See Schlup*, 513 U.S. at 324, 327. Accordingly, Phillips cannot overcome his procedural default of his two grounds for relief.

### IV. Conclusion and Recommendation

For the reasons stated above, the undersigned recommends that Phillips' Petition be **DISMISSED** because his Petition is untimely and/or Grounds 1 and 2 are procedurally defaulted.

Dated: September 25, 2018           */s/ Kathleen B. Burke*

                                    Kathleen B. Burke
                                    United States Magistrate Judge

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).